UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,                              CASE NO. 1:16-CR-215

v.                                                HON. ROBERT J. JONKER

PERIS DWIGHT SMITH,

                Defendant.

_____/

## ORDER

      Detective DeGroot obtained and executed a search warrant at a storage unit that Defendant and his cousin had rented. Defendant moves to suppress the fruits of the search because the affidavit failed to conform to Fourth Amendment requirements. The Court agrees and grants Defendant's motion.

## BACKGROUND

      Defendant Peris Smith and his cousin, Taneshea Smith, rented storage unit 210-E, located on Samrick Avenue in Belmont, Michigan, from West River Storage Suites on December 5, 2012. At Peris's request, Taneshea named herself as the "renter" of the unit[1] and signed the agreement. Defendant, however, provided his personal email address (perissmith@att.net) on the form and filled out other sections of the agreement. Additionally, Peris provided the cash payment for a year's rental

---

[1]Taneshea provided an incorrect last name on the rental application, but she also provided her driver's license to the storage facility employee. The employee used Taneshea's correct last name–as listed on her driver's license–to enter her contact information into the system and onto the lease documents.

of the unit and the storage unit locks. Julie Ribbens, an employee of the storage facility, helped Peris and Taneshea fill out the application. She testified that Peris was the one who "ran the show."

The storage facility's activity log shows the unit was accessed on December 7, 2012; December 30, 2012; January 23, 2013; February 15, 2013; February 16, 2013; and February 17, 2013. To access the unit, a person must first pass through a gate with an approved, personalized pass code. Once through the gate, the person must have a key for the lock on the sliding door of the unit itself. Taneshea's consistent testimony was that she never accessed the storage unit–or even returned to the storage facility–after her initial visit to fill out the rental application with Peris. Instead, she claimed Peris Smith alone accessed the storage unit.[2]

On March 1, 2013, Kent County Sheriff Deputy Tracey Ludwig was dispatched to West River Storage Suites on a report of a suspicious situation involving one of the storage units. The owner of the facility, Richard Dykhouse, reported that on February 18, 2013, he learned that Unit 210-E was slightly open and not secured properly. Specifically, the lock was affixed to the latch, but the latch was not in a proper position, leaving a two-inch gap between the floor and the unit's metal curtain door. During the following two weeks, Ribbens attempted to contact the renter using the contact information provided on the rental form, but was unsuccessful. Ribbens also emailed the address provided, but did not receive any acknowledgment.

On March 1, 2013, Dykhouse inspected the unit to ensure it had not become animal infested. Upon entering, he noticed that it was mostly empty except for a cardboard box, a small cooler, a

---

[2]Defendant does not affirmatively assert that he was the person who accessed the unit, but the Court finds by a preponderance of the evidence on the present record that for standing purposes, Defendant was the person accessing the unit. If the case proceeds to trial, the jury will obviously have to assess that issue independently and under a different standard of proof.

computer tower, and an open black plastic garbage bag. Dykhouse reportedly claimed at the time that the open garbage bag contained numerous credit cards–as many as 100. At the evidentiary hearing, however, he testified that he saw "20-30" cards, and after looking at the picture he took, revised the number down to 10-15. In any event, regardless of the specific numbers, he found what he saw to be "very suspicious," prompting him to take pictures of the interior and report the situation to the Kent County Sheriff. The picture shows some plastic cards, but not 100 of them, or even 20-30.

Deputy Ludwig responded to the owner's report. She saw "from the photo [the owner] took prior to leaving Unit 210-E, that there were several unknown credit cards within the black plastic garbage bag." (ECF No. 83-2, PageID.440). Additionally, she "could see a series of 12 digits on a credit card and another credit card with the activation stick still applied to the front of it." *Id.* However, the numbers were unreadable from the photo. *Id.* Ultimately, she informed the owner that she "could not lawfully search the storage unit." *Id.*

On March 7, 2013, Deputy Ludwig spoke to the owner of the storage unit again. The owner stated that he had left the overlock on the unit and had placed a second lock on it. The renter had still not accessed the unit. The owner "did not go back into the unit to see the specifics of the unknown credit cards or whose names were on them." *Id.*

In her March 1 police report regarding the incident, Deputy Ludwig noted "I do not have enough P/C, so far in this case, for a search warrant of the storage unit, however the alleged number of credit cards and the disappearance and no contact with the renter is quite suspicious." *Id.* She indicated that she was "sending this report up to the DB/Fraud Unit to see if there's anything else or any other leads this case may have." *Id.* Her report also made it clear that she had seen the picture

taken by the owner. As already noted, after seeing the picture, she described seeing "several unknown credit cards"; not 20-30, let alone 100.

On March 12, Deputy Ludwig provided Kent County Sheriff's Department detective John DeGroot with her incident report and a short email summarizing the events described above. In her email, Deputy Ludwig reiterated that she thought the situation was "suspicious," but that she did not "think . . . that [she could] legally get into the unit to see the ID's on the cards." Moreover, she noted that she had run her report by a sergeant, who had reached the same conclusion on the legality of a search. Deputy Ludwig had more overall experience in law enforcement than Detective DeGroot. The Sergeant likely did as well, as Detective DeGroot acknowledged in his testimony.

The next day, after reading the report and email, Detective DeGroot decided to seek a search warrant for the storage unit (ECF No. 82-1). He did nothing to investigate or corroborate the reported information. He did not look at the photo that Mr. Dykhouse took. He did not contact or talk with Mr. Dykhouse. He did not contact or talk with Ms. Ribbens. He made no effort to investigate the contact information left by the renters. He did not seek out the Sergeant who found a present absence of probable cause. He did not discuss with Officer Ludwig the reason she believed probable cause was lacking. He did not link, or attempt to link, the report of Mr. Dykhouse with any other current complaints or investigations of fraud or identity theft in the area. He did, however, decide he wanted a look inside the unit himself and prepared an affidavit in support of a search warrant based on his own conclusion that the present information was sufficient.[3]

---

[3]Detective DeGroot testified that, upon receiving reports such as Deputy Ludwig's in this case, his standard operating procedure was to view the location at issue. However, he did not recall whether he ever viewed the storage unit in this case. Even if he had, it would not amount to additional investigation or attempts to corroborate his claim. At most, it would have helped him ensure a correct description of the external appearance of the unit to be searched. The Court finds by a preponderance of the evidence that Detective DeGroot did not visit the site. If he had done so, he surely would have at least tried to talk with the owner or the owner's on-site manager, and all agree he did not do so. Nor is there any

The warrant affidavit described the location to be searched as "a 10' by 10' storage unit with a gray overhead door and the numbers 210 above the overhead door." *Id.* The affidavit stated that Detective DeGroot "is currently assigned as a detective in the Investigative Division and the Metro Fraud and Identity Theft Team" and "is currently investigating a possible credit card fraud and/or identity theft complaint involving numerous credits cards that were found in storage unit number 210 building E of West River Storage Suites . . . ." *Id.* at PageID.414. The affidavit also described the statement from Mr. Dykhouse reporting "numerous, possibly 100, credit cards," as well as the basic events discussed above. The affidavit, did not mention, however, that the owner took photographs of the unit and garbage bag. Nor did it describe those photographs, or report that Officer Ludwig, who did view the photo, described it as showing only "several" cards, not "as many as 100," as Mr. Dykhouse reportedly said at the time. Detective DeGroot also did not include Deputy Ludwig's statement regarding a lack of probable cause or the Sergeant's concurrence with Officer Ludwig, because he disagreed with that conclusion and did not think contrary law enforcement opinions were relevant. Instead, Detective DeGroot included only his own conclusion that "he ha[d] probable cause" because he "believe[d] that possession of large amounts of credit cards indicates activity of identity theft and/or criminal fraud." *Id.* Additionally, "[c]omputer equipment is also known to be used to store identification and/or account information and also recover and/or encode credit card information." *Id.* On March 13, 2013, 63rd District Court Magistrate Judge Varis Klavins authorized a warrant to search the storage locker identified in the affidavit and seize the items found there.

The following day, on March 14, 2013, Detective DeGroot and Wyoming Police Detective Cammenga executed the search warrant. They located what the warrant affidavit described, including

---

indication that Detective DeGroot had the access code he needed to get through the gate without talking to the owner.

"a small soft sided cooler, an IBM computer tower, a cardboard box, and a black garbage bag." *Id.* at PageID.417, 441. In the garbage bag were "numerous pieces of mail, credit cards, receipts, prepaid Boost phone boxes and paperwork, pages of notes contain[ing] numerous potential victim's identification information and other items of paperwork." *Id.* The return inventory does not specify the actual number of cards in the plastic bag.

On October 27, 2016, Defendant Peris Smith was indicted for making false claims and conversion of government funds as part of a false tax refund "stolen identity refund fraud" (SIRF) scheme. On March 13, 2017, Defendant filed his first motion to suppress evidence seized from a storage unit, claiming the warrant affidavit failed to establish probable cause (ECF No. 56). After the Court substituted Defendant's attorney, Defendant withdrew his original motion and filed a second motion to suppress (ECF No. 82). Additionally, Defendant moved for a *Franks* hearing, claiming the warrant affidavit contains misstatements and material omissions (ECF No. 83). The government opposes the motions (ECF No. 91).

The Court held a hearing concerning these matters on July 25, 2017. After a showing by the parties, this Court found on a preliminary basis that Defendant had standing to contest the search at issue, and that he was entitled to a *Franks* hearing to challenge the veracity of the warrant affidavit. The Court proceeded to hold an evidentiary hearing. Based on the Court's review of the record, and for the reasons set forth below, the Court reaffirms its prior preliminary finding that Defendant has Fourth Amendment standing to challenge the search at issue. Additionally, this Court holds that the warrant affidavit contained several critical misstatements and omissions, and that the reformed warrant affidavit fails to establish probable cause. The Court further finds that these deficiencies cannot be overcome by the *Leon* good-faith exception to the probable cause requirement.

Accordingly, the Court grants Defendant's motions, and suppresses the evidence seized from the storage unit in this case.

## DISCUSSION

Defendant Smith claims the government violated his Fourth Amendment rights under *Franks* because the warrant affidavit contains several misstatements and material omissions and does not provide probable cause for the officers to believe they would find evidence of criminal activity in the storage unit (ECF Nos. 82, 83). The government challenges Defendant's assertions on four grounds, claiming that: (1) Defendant lacks standing to assert a Fourth Amendment violation; (2) the warrant affidavit contains no affirmative false statements or material omissions; (3) the warrant affidavit established probable cause; (4) even if the warrant affidavit was insufficient to establish probable cause, the officers relied on the warrant in good faith (ECF No. 91).

## I.      Standing

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." U.S. Const. amend IV. To assert a Fourth Amendment violation, a defendant must first demonstrate standing by establishing a legitimate expectation of privacy in the area searched or the items seized. *Rakas v. Illinois*, 439 U.S. 128, 143 (1978). The defendant must prove both that he had a subjective expectation of privacy in the area searched and that society is "prepared to accept that expectation as objectively reasonable." *California v. Greenwood*, 486 U.S. 35, 39-40 (1988).

The Sixth Circuit addressed the issue of a defendant's expectation of privacy in a storage unit and its contents in *Garcia v. Dykstra*, 260 F. App'x 887 (6th Cir. 2008). In that case, the Sixth Circuit held that four purported owners of a set of tools in a storage unit had standing to pursue a

Fourth Amendment challenge to a police chief's entry into the unit, even though only one of the plaintiffs was a named lessee of the unit, and some of the plaintiffs may not have had a viable property interest in the tools. *Id.* at 893. The court reasoned that the plaintiffs demonstrated a subjective expectation of privacy in the tools because they placed them inside the storage unit and secured the unit with a padlock. *Id.* at 897. Additionally, the court held that the expectation of privacy was objectively reasonable because an individual "may reasonably expect that the contents of a closed, locked storage unit within a gated storage complex will remain free from public inspection." *Id.* at 898.

*Garcia* controls the issue of Defendant's standing to contest the search of the storage unit in this case. Like in *Garcia*, where the Sixth Circuit found the plaintiffs demonstrated a subjective expectation of privacy in tools because they placed them inside the storage unit and secured the unit with a padlock, Defendant demonstrated a subjective expectation of privacy in the items in the storage unit because he assisted in filling out the rental application for the unit, bought the storage unit lock, secured the unit with that lock, possessed the key to the lock, and accessed the unit through a secured gate on several occasions. Although Defendant's cousin Taneshea was the named renter of the storage unit, she filled out the application at Defendant's request and admitted she never intended to use the unit. It was Defendant–not Taneshea–who made the advance cash payment for a years' rent, filled out parts of the rental agreement, and listed his personal email address on the agreement. As the storage facility employee who helped Defendant and Taneshea fill out the rental agreement testified, Defendant "ran the show." Accordingly, Defendant has established that he had a subjective expectation of privacy in the storage unit at issue and its contents. *See Garcia*, 260 F. App'x at 898; *see also United States v. Johnson*, 584 F.3d 995, 1001 (10th Cir. 2009) ("[A]n

individual can have a recognized privacy expectation in a storage space even when he or she is not the lessee of the unit.") (citation omitted); *United States v. Johns*, 851 F.2d 1131, 1135-36 (9th Cir. 1988) (holding defendant had standing to challenge search of warehouse where he paid part of the rent and was co-owner of items found, even though his name did not appear on the lease).

Additionally, Defendant's expectation of privacy in the contents of the storage unit is objectively reasonable because, as the Sixth Circuit held in *Garcia*, a person "may reasonably expect that the contents of a closed, locked storage unit within a gated storage complex will remain free from public inspection." *Id.* Here, Defendant's cousin Taneshea provided a valid driver's license to rent the storage unit and the storage facility employee entered the information listed on her license into the facility's records. Defendant advanced a years' rent in cash, which the storage facility accepted. The storage facility provided Defendant with a ten percent discount because he paid cash in advance for a year's rent. Defendant's email address further identifies him as a person associated with the storage unit on the rental form. Defendant closed and secured the unit on several occasions, albeit improperly on the occasion in question. At the time of the search, Defendant's rental term had not yet expired; in fact, Defendant had eight months remaining on the rental term.

The government attempts to distinguish *Garcia* by arguing that this case falls under the line of cases holding that a defendant does not have a reasonable expectation of privacy in property obtained through use of an alias. *See United States v. Bruce*, 396 F.3d 697, 709 n.7 (6th Cir. 2005) *vacated in part on other grounds*, 405 F.3d 1034 (6th Cir. 2005); *United States v. Robinson*, 390 F.3d 853, 869 n.24, 30 (6th Cir. 2004). The government points to the fact that Defendant rented the unit in his cousin Taneshea's name, and that she initially provided a wrong last name and an incorrect phone number to the storage facility (ECF No. 91, PageID.626). The Sixth Circuit,

9

however, has also held that "[t]he legality of a person's possession cannot be the lynchpin of their Fourth Amendment standing." *United States v. Carnes*, 309 F.3d 950, 960 (6th Cir. 2002). In any event, as discussed above, there is no dispute that Taneshea provided a valid driver's license to rent the storage unit and that the storage facility employee entered the information listed on her license into their records. Defendant's email address identifies him as a person associated with the storage unit on the rental form. Moreover, Defendant advanced a years' rent in cash, which the storage facility accepted. Accordingly, this is not a case where the defendant used a false name or a stolen identity to illegally obtain possession over the property at issue. *See Bruce*, 396 F.3d at 709 n.7 (finding no expectation of privacy in hotel room that defendant used alias to obtain); *Robinson*, 390 F.3d at 869 n.24, 30 (finding no expectation of privacy in package addressed to defendant under an alias).

Additionally, the government cites *United States v. Oswald*, 783 F.3d 663, 666-69 (6th Cir. 1986), among other cases, for the proposition that even if Defendant had a reasonable expectation of privacy in the storage unit, he forfeited that right because he abandoned the storage unit. The government points to Defendant's failure to respond to the storage unit owner's attempts to contact him over a period of two weeks and the renters' failure to access the unit after the storage facility owner placed an overlock on it. It is true that a defendant forfeits any legitimate expectation of privacy he might have in property when he abandons that property. *Oswald*, 783 F.3d at 666-69. "[A]bandonment is a question of intent and may be inferred from the defendant's statements, conduct, and other objective indicia." *United States v. Labelle*, 390 F. App'x 539, 416, 421-42 (6th Cir. 2010). This Court, however, is not persuaded that abandonment is established here. As discussed above, Defendant paid cash in advance for a year-long rental of the storage unit. At the time of the

search, that term had not yet expired; eight months remained on the rental term, and only four months had expired. During the rental term, materials were placed in the unit and the storage facility recorded visits up to the time of the events at issue. It appears that Defendant attempted to secure the unit during his last visit, but failed to do so properly. In light of the totality of the circumstances, the two-week window during which the storage unit owner was unable to contact the renters is insufficient to establish abandonment in this case.

"People generally have a reasonable expectation of privacy in a storage unit, because storage units are secure areas that 'command a high degree of privacy.'" *United States v. Johnson*, 584 F.3d 995, 1001 (10th Cir. 2009). This case is no exception to that general rule. Defendant retained an interest in the storage unit at issue and could have reasonably expected it would not be entered. Accordingly, Defendant has standing under the Fourth Amendment to contest the search at issue.

## II. The Veracity of the Affidavit

Defendant challenges the veracity of the affidavit underlying the warrant, claiming it offers a distorted and incomplete picture of the government's very limited investigation in this case (ECF No. 83). "An affidavit underlying a search warrant is presumptively valid." *United States v. Woodley*, No. 15-cr-20007, 2016 WL 1387947, at *3 (E.D. Mich. April 8, 2016) (citing *Franks v. Delaware*, 438 U.S. 154, 171 (1978)). But a warrant will be voided and the fruits of the search excluded if a defendant establishes by a preponderance of the evidence "that the affiant knowingly and intentionally, or with reckless disregard for the truth, included a false statement or material omission in the affidavit; and . . . proves that the false statement or material omission is necessary to the probable cause finding in the affidavit." *United States v. Rose*, 714 F.3d 362, 370 (6th Cir. 2013) (citing *Franks*, 438 U.S. at 171-72). The Sixth Circuit has "repeatedly held that there is a higher bar

for obtaining a *Franks* hearing on the basis of an allegedly material omission as opposed to an allegedly false affirmative statement." *United States v. Fowler*, 535 F.3d 408, 415 (6th Cir. 2008) (citing cases). This is "because of the potential for endless rounds of *Franks* hearings due to potentially endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to the defendant's benefit." *Id.* (internal quotation marks and citations omitted). "If the defendant does succeed in making a preliminary showing that the government engaged in 'deliberate falsehood' or 'reckless disregard for the truth' in omitting information from the affidavit, the court must then consider the affidavit including the omitted portions and determine whether probable cause still exists." *United States v. Atkin*, 107 F.3d 1213, 1217 (6th Cir. 1997) (citation omitted).

The Sixth Circuit has held that a material omission is made with "reckless disregard for the truth" if an officer "purposefully [withholds] information" in preparing an affidavit and knows the affidavit was "incomplete or misleading." *United States v. West*, 520 F.3d 604, 612 (6th Cir. 2008). In *United States v. West*, the defendant, among other things, challenged an affidavit that was submitted by a detective who, in conjunction with a missing person investigation, sought a warrant to search the defendant's van. 520 F.3d at 608-09. The warrant was issued based on the affidavit, and the police found incriminating evidence in the van. *Id.* The affidavit, while accurately describing certain steps in the investigation, omitted the fact that attempts to verify certain allegations in the affadavit had been unsuccessful. *Id.* The district court denied the defendant's motion to suppress. *Id.* In reversing the district court, the Sixth Circuit found that the officer had "purposefully withheld information in preparing the affidavit and knew the affidavit was "incomplete and misleading." *Id.* at 612. The court held that "[t]he fact that the affidavit . . . did not accurately reflect the facts known"

to the detective "at the time the affidavit was sworn evinces a reckless disregard for the truth." *Id.* at 611. The court concluded that "an affidavit that contains knowing or reckless falsities" cannot be "save[d] by *Leon* and, therefore, the evidence obtained as a result of the affidavit should have been suppressed. *Id.* at 612.

Detective DeGroot made two affirmatively misleading statements in the warrant affidavit. First, he stated: "your affiant is currently investigating a possible credit card fraud and/or identity theft complaint involving numerous credit cards that were found in a storage unit" (ECF No. 83-1, PageID.433). But that paints a misleading picture because the affiant, Detective DeGroot, was not personally doing anything fairly characterized as investigation. Detective DeGroot testified that he personally had actually done nothing to investigate when he filled out the affidavit. All he did is review Deputy Ludwig's report and email–both of which reported conclusions that probable cause was lacking. In fact, Detective DeGroot had not even done a complete review of the record compiled by Deputy Ludwig–most notably, he had not reviewed the photo taken by the reporting citizen. There was certainly no ongoing investigation by anyone in law enforcement beyond this initial report of Deputy Ludwig.

If Detective DeGroot had performed an actual investigation or even fully reviewed the Deputy's report, including the photo, he also would not have been honestly able to report only the claim of "possibly 100" credit cards. The photograph itself reveals only "several" credit cards (ECF No. 91-1, PageID.645), which is what Officer Ludwig reported after viewing the photo. In fact, after viewing the photo on the stand, Detective DeGroot acknowledged that it did not show 100 cards, and that he would have known that had he looked at the photo before filling out the affidavit. Dykhouse, the storage facility owner, also examined the photo on the stand, and testified that he saw "10-15

13

cards" in the photo. This is consistent with what Deputy Ludwig–who also reviewed the photographs–described in her report (ECF No. 83-2, PageID.440). With all this information available from the written record and photograph alone, it is painfully obvious that Detective DeGroot was not doing anything to investigate. At most he was hoping the search warrant would kick off an investigation. But this has it backwards–law enforcement must first investigate enough to establish probable cause, and only then seek access to private property by warrant.

Detective DeGroot's misstatements are even more damning in light of his omissions. Detective DeGroot failed to inform the judge: (1) that the owner of the storage unit took photographs of the interior of the storage unit; (2) that Deputy Ludwig's described seeing "several" cards on the photograph, not 100; and (3) that a photograph was even available. There is no dispute that Detective DeGroot was aware of the photos; he testified that at the time he submitted the affidavit, he knew Deputy Ludwig had possession of the photos. Because of the very limited number of items found in the storage unit and their innocuous nature, Detective DeGroot's omission of any mention of the photos and failure to provide a copy of the photos themselves alters in a significant manner the way a court would evaluate whether the credit cards located in the storage unit were suspicious. *See United States v. Giffords*, 727 F.3d 92, 101 (1st Cir. 2013) (holding omission from affidavit of information regarding electricity usage in a house supported a finding of reckless disregard because it affected determination of whether that usage was suspiciously high). Not only did Detective DeGroot omit any mention of the photos, but his description of the storage unit's interior sharply contrasts with what the photograph actually reveals. If Detective DeGroot had actually reviewed the photographs, he would have realized that they displayed "several," not "possibly 100" credit cards.

As a result, Detective DeGroot provided an incomplete and misleading recitation of the items displayed in the photos, in reckless disregard of what the facts really were.

By omitting any mention of the photos and providing a misleading account of what the storage unit contained, Detective DeGroot effectively usurped the magistrate judge's duty to independently determine probable cause. *See United States v. Perkins*, 850 F.3d 1109, 1116-19 (9th Cir. 2017) (holding officer's omission of images of alleged child pornography and descriptions of one of the images from warrant affidavit for search of defendant's computer was intentional or reckless); *United States v. Lull*, 824 F.3d 109, 116-17 (4th Cir. 2016) (holding that an affiant acted at least recklessly by omitting facts about an informant's credibility and "usurp[ed] the magistrate's role" in determining probable cause). Given the circumstances of this case, Detective DeGroot was required, at a minimum, to provide a copy of the photo for the magistrate judge's independent review. Instead, he merely proffered his own conclusion about the number of credit cards reported by the storage facility owner, based on no investigation and an incomplete review of the investigation of others. This the Fourth Amendment does not allow. *See West*, 520 F.3d at 612 (granting motion to suppress where affiant "purposefully withheld information in preparing the affidavit and knew the affidavit was "incomplete and misleading*."*).

Second, Detective DeGroot omitted the fact that Deputy Ludwig and another Sergeant had already concluded that probable cause did not support issuance of a search warrant at present. At the time he submitted the affidavit, Detective DeGroot knew of Deputy Ludwig's position on the legality of the search. In fact, he testified that he used Deputy Ludwig's report and her email as a template to draft his own affidavit. Detective DeGroot testified that he omitted Deputy Ludwig's opinions about probable cause because it was not a patrol officer's role to make that determination. But, in

the warrant affidavit, Detective DeGroot *did* include his own opinion that "he ha[d] probable cause to believe" that evidence of credit card fraud and identity theft would be found in the storage unit. Essentially, the affidavit included Detective DeGroot's own conclusion–reached after an incomplete review–that probable cause was established, but omitted the fact that Deputy Ludwig–a patrol officer with more experience that Detective DeGroot–and a sergeant had reached the opposite conclusion after first-hand review of all the available evidence.

The misstatements and omissions detailed above reveal a clear, intentional pattern in Detective DeGroot's actions: he selectively included information supporting probable cause, but omitted information that undermined probable cause. Detective DeGroot provided the magistrate judge with a skewed version of the evidence that overstated the suspicious nature of the property found in the storage unit. Detective DeGroot's description of his own conclusion and the storage unit owner's story was no reliable substitute for his omissions. As discussed above, Detective DeGroot's account misrepresented his familiarity with the case and provided, at best, a misleading picture of the nature of the evidence.

In summary, this Court finds that Detective DeGroot omitted critical information from the affidavit and made several distorting misrepresentations that recklessly disregarded the true picture available to law enforcement at the time. Detective DeGroot acted with at least a reckless disregard for the truth by misrepresenting the nature of his investigation and the evidence located in the unit, failing to provide the magistrate judge with copies of the photos relied on by the investigating officer, and omitting portions of Deputy Ludwig's report and email, which were fresh in his mind, for the magistrate judge's independent review. Because Detective DeGroot "omitted facts required to prevent technically true statements in the affidavit from being misleading," the Court must now

16

consider whether the affidavit, "once corrected and supplemented, establishes probable cause." *United States v. Ruiz*, 758 F.3d 1144, 1149 (9th Cir. 2014) (quoting *Ewing v. City of Stockton*, 588 F.3d 1218, 1223 (9th Cir. 2009)).

## III.    Probable Cause

Under the second step of *Franks*, the question is whether the omitted fact is "material"; that is, whether it is "necessary to the finding of probable cause." *Franks*, 438 U.S. at 156. The key inquiry is "whether probable cause remains once the evidence presented to the magistrate judge is supplemented with the challenged omissions." *Ruiz*, 758 F.3d at 1149. "Probable cause exists 'when there is a fair probability given the totality of the circumstances that contraband or evidence of a crime will be found in a particular case.'" *United States v. Greene*, 250 F.3d 471, 479 (6th Cir. 2001) (citation omitted). To establish probable cause to justify the search of a place, an affidavit in support of a search warrant "must contain facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity." *United States v. Danhauer*, 229 F.3d 1002, 1006 (10th Cir. 2000). "A court must look to the 'totality of the circumstances' . . . in order to answer 'the commonsense, practical question' of whether an affidavit is sufficient to support a finding of probable cause." *United States v. May*, 399 F.3d 817, 823 (6th Cir. 2005) (quoting *Illinois v. Gates*, 462 U.S. 213, 230 (1983)).

"The standard of review for the sufficiency of an affidavit 'is whether the magistrate judge had a substantial basis for finding that the affidavit established probable cause to believe that the evidence would be found at the place cited.'" *Greene*, 250 F.3d at 478 (quoting *United States v. Davidson*, 936 F.2d 856, 859 (6th Cir. 1991)). A judge's "determination of probable cause is accorded great deference by a reviewing court" and the "decision to grant a search warrant should

17

only be reversed if arbitrarily exercised." *Id.* The deference accorded a magistrate judge's probable cause determination, however, is not boundless. *See United States v. Leon*, 468 U.S. 897, 914 (1984). Specifically, a court should not defer to a magistrate judge's probable-cause determination if it is "a mere ratification of the bare conclusions or 'hunches' of others." *United States v. King*, 227 F.3d 732, 740 (6th Cir. 2000) (quoting *Gates*, 462 U.S. at 239).

Once corrected, the search warrant application would include Deputy Ludwig and the sergeant's opinion that probable cause was not established at that time. Additionally, the warrant affidavit would include a copy of the photo taken by the storage unit owner, and any probable cause determination would be based on direct review of the photo itself. Thus, Detective DeGroot's written description of "possibly 100" credit cards in the garbage bag, based only on Mr. Dykhouse's initial estimate, would be in proper context. Apart from the photo, Dykhouse's description of the contents in the unit and his inability to contact the renters for two weeks are the only other potentially suspicious facts. Under these circumstances, the Court holds that a corrected warrant affidavit would not support probable cause.

Even looking at the original four corners of the warrant affidavit only, the Court has doubts about probable cause. There are really only three facts identified: (1) the property owner's report of a garbage bag containing numerous–as many as 100 cards; (2) an inability to contact the renter over a two-week period in a lease with eight more months to run; and (3) a computer. Even apart of the *Franks* reformation, this is a very thin statement of probable cause. The uncorroborated report of 100 credit cards is certainly suspicious, but not enough in context. Moreover, as already seen, it is a seriously distorted picture of what could actually be seen.

18

The Court is not persuaded that the owner's description of "numerous, possibly 100, credit cards" establishes probable cause. It is true, as the government contends, that Dykhouse identified himself and likely honestly reported what he believed he saw. (By the time of the evidentiary hearing, however, the number of cards he thought he saw had shrunk considerably–10-15 after looking at the picture he took). And although the Sixth Circuit has held in the context of contraband–such as drugs–that "[s]tatements from a source named in a warrant application . . . are generally sufficient to establish probable cause without further corroboration," *United States v. Hodge*, 714 F.3d 380, 384-85 (6th Cir. 2013) (citation omitted)), that general rule has not been extended to cases that do not include contraband. In contrast to drug paraphernalia, there is nothing intrinsically incriminating about credit cards, even several of them.[4] This is because credit cards are part and parcel of everyday life; they are found in most homes around the country. *See United States v. Bass*, No. 11-20704, 2012 WL 1931246, at *9 (E.D. Mich. May 29, 2012) ("[C]redit cards are very common items that are found in many, if not most, homes . . . . [They] are not items found exclusively in [locations] where identity theft is occurring.").

The government argues that the number of credit cards, coupled with their presence next to a computer tower, made the owner and officers reasonably suspicious of identity theft. But it is not illegal to possess a large number of credit cards and a computer. In fact, combined ownership of a number of credit cards and a computer tower is a quite common feature in households across the country. And the fact that the credit cards were in a garbage bag renders them even more innocuous. This could indicate someone cleaned house before or after moving. It could be the result of someone

---

[4]The Court checked its own wallet after the hearing and found 15 plastic cards, including credit cards, gift cards, ID cards, insurance cards, library cards and other plastic cards, that all look like credit cards.

deciding to get rid of all their plastic and use cash instead (as heavily advertised in this area by Dave Ramsey of Financial Peace University). In fact, the storage unit was rented in cash for a stated "household" purpose, which is consistent with someone who no longer wants to use credit cards in their household. Accordingly, the Court concludes that the credit cards are not intrinsically incriminating and fail to establish probable cause. *See United States v. McLevain*, 310 F.3d 434, 438 (6th Cir. 2002) (holding that twist tie, cut cigarette filter, and spoon with residue found in house suspected of being a location for drug manufacturing failed to establish probable cause because those items were common household items and not "intrinsically incriminating").

The affidavit does include some information about the affiant's assessment of the probable significance of the number of credit cards based on his professional standpoint. Specifically, Detective DeGroot concludes the warrant affidavit by stating that, "from [the affiant Detective DeGroot's] training and experience, [he] believe[d] that possession of large amounts of credit cards indicates activity of identity theft and/or criminal fraud." *Id.* Additionally, "[c]omputer equipment is . . . known to be used to store identification and/or account information and also recover and/or encode credit card information." *Id.* This information, however, is very generic: it involves primarily a general discussion of what identity theft and fraud operations entail that could be placed in any identity theft or fraud affidavit. It does not touch on or evaluate the storage facility owner's observations on the basis of the affiant's general knowledge of identity theft operations or of any then-ongoing identity theft lead or operation. To the contrary, if anything, the general discussion goes to corroborating the affiant's assessment of the number of credit cards present, not to corroborating the information provided by the storage unit owner or tying it to reports of identity theft in the area. *See United States v. Hamie*, 165 F.3d 80, 83 (1st Cir. 1999) (holding that criminal nature of credit

cards was immediately apparent to an officer where he found large number of cards in the context of a then-ongoing credit card and identity fraud investigation).

The Court believes that the owner's inability to reach the renters is only marginally relevant, if at all, in the context of this case.[5] The storage unit was rented and prepaid for a year, and the storage facility owner gave the renters a discount to do so. The events at issue occurred within the rental term. In fact, there were still eight months to run on the term. It is also undisputed that, at that point, the owner had placed an overlock on the unit, so there was no risk to the police or the storage facility owner in waiting to see if the renter came back to retrieve the contents; if other leads could be developed; or if there would eventually be a better case for abandonment.

Accordingly, viewing the information in the reformed affidavit in its totality–or even just the original four corners–the Court finds that there was not probable cause for the warrant.

## IV.    *Leon* **Good Faith Exception**

Finally, because the affidavit in this case contained knowing and reckless falsities, and because the affiant on the warrant application executed the warrant himself, the good faith exception to the exclusionary rule cannot save it. "Though evidence obtained in violation of the Fourth Amendment is generally excluded, the Supreme Court has held that the exclusionary rule 'should be modified so as not to bar the admission of evidence seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective.'" *United States v. Frazier*, 423 F.3d 526, 534 (6th Cir. 2005) (quoting *United States v. Leon*, 468 U.S. 897, 905 (1984)). "The 'good faith inquiry is confined to the objectively ascertainable question of whether a reasonably well-trained

---

[5]Dykhouse or his employee was, in fact, able to reach one of the contact persons listed on the rental agreement–Defendant's mother Connie–but that information was not relayed to the renters in the couple of weeks before the police searched the unit and seized its contents.

officer would have known that the search was illegal despite the magistrate's authorization.'" *Id.* (quoting *Leon*, 468 U.S. at 922-23 n.23). The good-faith exception does not apply in the following circumstances:

> 1) the supporting affidavit contained knowing or reckless falsity; 2) the issuing magistrate wholly abandoned his or her judicial role; 3) the affidavit is "so lacking in probable cause as to render official belief in its existence entirely unreasonable;" or 4) where the officer's reliance on the warrant was neither in good faith nor objectively reasonable.

*Frazier*, 423 F.3d at 533.

Here, Detective DeGroot purposefully withheld information when he prepared the affidavit. He knew his affidavit was incomplete and misleading to the issuing magistrate judge. He was also one of the officers who executed the search warrant. Accordingly, he could not have reasonably relied on the search warrant. *See West*, 520 F.3d at 612 (holding *Leon* good faith exception inapplicable where affiant officer purposefully withheld information in preparing the affidavit and knew the affidavit was misleading). The *Leon* good faith exception does not apply to save the warrant affidavit. *See id.*

## CONCLUSION

**ACCORDINGLY**, **IT IS ORDERED** that Defendant's motions (ECF Nos. 82, 83) are **GRANTED**. The evidence seized under the warrant must be suppressed in Defendant's case.

**IT IS SO ORDERED.**

Dated:    July 31, 2017            /s/ Robert J. Jonker
                                  ROBERT J. JONKER
                                  CHIEF UNITED STATES DISTRICT JUDGE